## Case No. 7,003.

### The ILLINOIS.

[Brown, Adm. 13.] [1]

District Court, D. Michigan. March, 1857.

PRACTICE—SETTING ASIDE DECREES—RULE 40.

1. It seems a court of admiralty has no general power, at least after expiration of the term to set aside a final decree on the ground of oversight, inadvertence, or mistake.

[Cited in U. S. v. Leng, 18 Fed. 26.]

2. The ten days allowed by rule 40 for setting aside a decree, are restrictive, and a motion made after this time cannot be entertained.

[Cited in The Oriental, Case No. 10,569a; Allen v. Wilson, 21 Fed. 884.]

This was a motion by William Dixon, master of the propeller Illinois, to open a decree obtained by default, and for leave to answer. A libel for collision was filed against the propeller, September 3d, 1855. The propeller was seized, and the usual stipulation given, to answer judgment, on the 15th of the same month. Certain depositions were taken in Cleveland on the 26th, and upon October 23d, no answer having been filed, although an appearance had been put in, a default was entered, and the cause referred to the clerk to assess damages. On October 25th he made his report, and on the 29th a final decree was entered for $1,926 and costs. An appeal was taken from this decree, November 6th, and in the following June the appeal was dismissed by the circuit court. On August 26th, 1856, this motion was made upon affidavits of merit, and a further showing that claimant's proctor was absent from the city when the time given to answer had expired and

---

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

the decree was taken, and that he had taken the appeal supposing the case could be reheard upon the merits. An answer was also tendered.

James V. Campbell, for the motion.
John S. Newberry, contra.

WILKINS, District Judge. Upon the return day of the process in this case, twenty days were taken by claimants to answer. At the expiration of this time, his counsel being engaged in the trial of a cause at Monroe, which had been unexpectedly prolonged, his default was taken, and a final decree was entered, October 29, 1855, for $1,926. Claimant's counsel returned from Monroe a few days after the decree was entered, and at once took an appeal to the circuit court. This appeal was, however, dismissed upon the ground that an appeal would not lie upon a decree taken by default. He now moves the court to open the decree, and for leave to answer. Under general admiralty rule 29, the court may, in its discretion, set aside a default, and admit the defendant to answer at any time before final hearing and decree, upon payment of costs. This rule obviously has no application to cases where a final decree has been entered. Under rule 40, the court may, in its discretion, upon motion of defendant and payment of costs, rescind a decree by default and grant a rehearing, at any time within ten days after the decree has been entered. The material point to be determined in this case is whether the court has power thus to rescind a decree not only after the ten days have expired, but when a whole term has intervened between the rendering of the decree and the making of the motion. Aside from the rule, I have very grave doubt whether a court of admiralty ought to open a final decree, particularly after expiration of the term, upon the ground of oversight, mistake, or forgetfulness on the part of defendant or his counsel. The English authorities are unanimous in holding that a final decree cannot be opened upon this ground.

In the case of The Vrouw Hermina, 1 C. Rob. Adm. 163, 168, a decree was rendered, January 27, 1799. On the 7th of February the counsel moved to open it, on the ground of a mistake on his part. The court (Sir W. Scott) says, "I will not go so far as to lay it down universally, that it is not in the power of the court to reconsider its decrees on very particular occasions." Speaking of the case then before the court, he says: "As a precedent, it would be a practice highly dangerous, and the liberty of reviewing its decrees, if it exists, which I do not affirm, is a liberty which the court would exercise with very great caution; because I foresee that, were applications of this sort to be easily admitted, they would be very frequently made on reasons much less sincere than those which are now offered to the court." "Without discussing the power of reviewing a sentence," he rejects this application: In the case of The Elizabeth, 2 Act. 57, application was made to rescind a decree condemning the cargo, on the ground that there had been an understanding that upon the production of certain affidavits consent should be given to a rescission of the decree—and these proofs were now produced—and the counsel cited a case, to show that the court would rescind its decrees. But the court (Sir John Nicholl) says: "As far as I recollect that case, it rather proved the rule that this court does not rescind its decrees. The motion to rescind was made upon a reference to the registrar and merchants; but was refused, as it was said it was not the practice of this court to rescind its decrees, and open the matter anew, whatever other redress the parties might obtain by an application to the court, should it be proved they were materially aggrieved,"—and the application was refused.

The case cited by the counsel above was that of The Geheimirath [2 Act. 58, note], decided in 1798, in which it was represented to the court that since the decree the proofs upon which the decree had been rendered had been impeached, and shown to be fraudulent, and a motion was made to rescind and allow evidence to be given of that fraud. "But the court refused, and said, their decree being final, it would be contrary to their practice to rescind it and open the subject anew; nor where even it appeared a fraud had been practiced, they could not go out of the order of their practice; the parties, however, might apply to the court in another shape, if they could satisfactorily prove they were aggrieved." In the case of The Fortitudo, 2 Dod. 58 (June, 1815), the libellants commenced one action on a bottomry bond—then dismissed it, alleging the claim was settled. Shortly after they commenced a new suit, on the same bond. The defendants moved to dismiss the latter suit, on that ground—and the court granted the motion, with costs, and demurrage. The court (Sir W. Scott, p. 70), after commenting on the affidavits, says: "They do not, in my apprehension at least, render it necessary that I should inquire how far the permission again to open a case which has been once closed comes within the range of that large discretion with which this court is by its commission intrusted. It might, perhaps, within the limits of that very extended equity which it is in the habit of exercising, deem it not improper in some cases to suffer a cause to be reopened. But it certainly would not do so unless there existed very strong reasons to show the propriety of the measure. I feel no hesitation in saying that mere negligence, or oversight, would not be a sufficient ground for such an extraordinary interposition of the authority of the court. A direct case of

fraud, or something equivalent to it must be made out, before I can suffer such a step to be taken." And then he says, in regard to the affidavits, "Let us see, then, whether there be any such ground in the present case. There has been no fraudulent concealment or withholding of documents. The master has sworn, and it is not denied that he produced all the papers and delivered them over to the (libellant, who) must be presumed to have examined and scrutinized them. They cannot now be heard to say that they acted improvidently and without due caution. If they did so in point of fact, they must abide by the consequences of their own negligence."

A case relied upon by the defendant's counsel is that of The Monarch, 1 W. Rob. Adm. 21, decided in 1839. An interlocutory decree had been pronounced by Sir John Nicholl, deceased, after a hearing on evidence, it being a case of collision, declaring both parties in fault, and referring the cause to the register to take accounts, &c. A question of costs was afterwards raised, and a motion made to alter the decree in that particular; and a decision made in the house of lords, in 1824, was cited to show that in such a case the costs should have been (as a matter of law) decreed differently. Doctor Lushington, who heard the motion, refers to that case, and says that if that case had been brought to the notice of Sir John Nicholl he would unquestionably have varied the decree to conform to it, as regards the costs, if it had been in his power. He then goes on to consider whether he would have had the power, according to the practice of the court. He says (page 26): "If it was a frequent practice to alter the decisions of the court, much evil and inconvenience would doubtless ensue in consequence. At the same time, it is to be observed that great injustice may be occasioned if this court has not such a discretionary power of varying its decrees as is possessed by other courts of this country. The court of chancery, before enrollment of a decree, may, and often does alter, vary and amend it, &c." This case does not sustain the defendant. In the first place, there had been no final decree at all— and the case was still before the court, standing on a mere "interlocutory" decree of reference—and yet the court hesitated much about granting the motion. In the second place, the amendment which was allowed was one of law entirely, and not of facts. It was a case of an error of the court, as to the law—an error apparently of record. Again, it was an amendment, merely, and not a rescission—still less a re-opening of the case for new proofs. Judge Conkling (2 Adm. p. 367), commenting on this case, says: "It seems very clear that the learned judge entertained no notion of any power in the court analogous to that exercised by courts of equity upon a bill of review, or of any power to grant a rehearing upon questions of fact." "The error to be corrected in the case before him was an error of law,"—and he says that this is the only case that contains, so far as he has discovered, an explanation of the views entertained by the high court of admiralty on this point.

These cases, extending over a period of sixty years, show that negligence, inadvertence, oversight, mistake of counsel or party, are no grounds for rescinding decrees, on motion, whatever other mode there may be. Fraud, or its equivalent, is the only ground, and in one case even that was held not to be good ground. The courts of admiralty in this country apparently follow the same practice. In the case of The Avery [Case No. 672], a decree had been rendered, condemning as prize a British vessel and cargo; afterwards a claim was presented by certain merchants of Morocco, alleging the property to be theirs, and asking that the decree be rescinded. The court refused. And Judge Story says that in cases of prize, a reasonable time is allowed for neutral claimants to interfere, "and if no claim is interposed within that time, condemnation follows of course, in poenam contumaciae. Nor is this a mere arbitrary regulation. It is to be found in analogous cases in the common law, &c.," "at all events, it is a part of the admiralty law which this court is bound to respect, and we are not at liberty, upon any notions of supposed inconvenience, to create a novel regulation. If the present be found unsuitable to our circumstances, as a maritime power, it will be for the legislature to devise a more just and equitable rule. Stare decisis is a great maxim in the administration of the law of nations." "This court can have no more jurisdiction to revive or review the cause, or to sustain the present application, than it can have to adjudicate upon any other cause which has been determined within twenty years." "It is utterly incompetent in this court, sitting as such, to grant an appeal in a cause which is no longer within their cognizance."

The case of The Martha [Case No. 9,144], decided in 1830, is in point, and the court, Judge Betts presiding, lays down the doctrine and its reasons at full length. In this case, a decree had been pronounced, dismissing the libel, with costs; afterwards, and in the following term, a motion was made to vary the decree as to the costs, and the motion was heard and granted. But on another motion being made for a decree against the sureties for those costs, the matter again came up, and the court vacated the last order, the judge observing he had supposed, when he made that order, that the case was still open. He says: "I should certainly never have allowed the argument in this cause to proceed, unless I had supposed that the whole case was under the control of the court, and that the former decree stood suspended until a decision could be had upon the question of costs." "The proposition now before the

court is, whether a court of admiralty, after hearing and definitive decree, can, of its own authority, rehear the cause or nullify the decree at any time subsequent to the term in which it is rendered." "The proceeding in this case had all the effect of a rehearing—the case had been disposed of." He alludes to the practice in the English admiralty and ecclesiastical courts, and in the French courts. As to the latter, he says: "In the French practice, which conforms very closely to the civil, the judgment becomes perfect as soon as it is pronounced, and the judge cannot correct it after the rising of the court, and after the register has entered the judgment upon the minutes as it was given." Cites Poth. Civ. Proc. c. 5, art. 2. He says that courts of chancery allow a rehearing upon sufficient reasons, at any time before decree enrolled, "but this practice has never been introduced into the courts of common law or admiralty." The judge then gives the reasons for this rule, as derived from "the character of the suits usually prosecuted here." "Usually it is of the last importance to suitors here to have an immediate dispatch of their business. Seafaring men are not in circumstances to conduct protracted and reiterated litigations upon their claims and it is usually better for their interests to have prompt decisions, even though adverse to their demands. Experience, I believe, fully justifies the remark, that whether in the instance or the prize courts, every delay and appeal is of serious detriment to the mariner's interest. The sum in dispute is usually small and of immediate necessity to the suitor. It is for his interest, therefore, that the most speedy decision possible should be obtained, and that when it is adverse to him, he should rather go immediately to his employment than linger over the contingencies of a reconsideration of his case. These views have probably led to the exclusion from courts of admiralty of the practice referred to, and I concur in the sentiments of the eminent men sitting in the English admiralty and consistory courts upon this point, that it is a matter of great doubt whether a power of this description should be exercised in this court without the free consent of all parties to be affected by it."

In the case of The New England [Case No. 10,151], a petition, in the nature of a libel for a rehearing, or of a libel of review, had been filed. In deciding whether such a libel was admissible in admiralty practice, the court (Judge Story) refers to the case of The Fortitudo, above cited, and then says: "But I am not aware that after the decree has been enrolled or entered on record, and the term has passed, that any court of admiralty at least in this country, has ever entertained an application for rehearing. In the high court of prize commissioners in England, it is said to be the practice never to rescind a decree after it is passed, or to open the subject anew. But at the same time it was, by implication, admitted that another mode of redress might be adopted, meaning, I suppose, that a libel in the nature of a bill of review in equity might be sustained, &c." A libel of review is, of course, very different from a "motion." These cases in England and America settle this point, it would seem, beyond controversy, that courts of admiralty cannot, on motion, rescind a decree. There may be another form of remedy, but what that is we are not here called upon to discuss. Judge Story seems to think a libel of review would lie, but the present is a mere motion. In this respect (of not rescinding a decree after the term is passed) other courts follow the same rule.

In Hudson v. Guestier, a question was decided in the supreme court of the United States, at February term, 1810 (6 Cranch [10 U. S.] 281). At February term, 1812, a motion was made that the case be reheard (7 Cranch [11 U. S.] 1), but the court say, "that the case could not be reheard after the term in which it had been decided." This case is a leading one. It is cited by Judge Story in The Avery, above cited (1815); by Judge Betts in The Martha, 1830 [supra]. In Martin v. Hunter's Lessee, 1 Wheat. [14 U. S.] 355 (1816), the court say: "A final judgment of this court is supposed to be conclusive upon the rights which it decides, and no statute has provided any process by which this court can revise its own judgments. In several cases which have been formerly adjudged in this court, the same point was argued by counsel, and expressly overruled. It was solemnly held that a final judgment of this court was conclusive upon the parties, and could not be re-examined." In Sibbald v. U. S., 12 Pet. [37 U. S.] 491 (1838), the court say: "No principle is better settled, or of more universal application, than that no court can reverse or annul its own final decrees or judgments, for errors of fact or law, after the term at which they have been rendered, unless for clerical mistakes, or to reinstate a cause dismissed by mistake —from which it follows that no change or modification can be made, which may substantially vary or affect it in any material thing. Bills of review in equity, and writs of error coram vobis at law, are exceptions which cannot affect the present motion." In Wash. Bridge Co. v. Stewart, 3 How. [44 U. S.] 425 (1844), the court say: "The want of power in this court to review its judgments or decrees, has been so frequently determined by it, that it is not now an open question."

In the circuit court of the United States the same rule prevails at law and in equity. In Albers v. Whitney [Case No. 137], a motion to amend a judgment by inserting "John," instead of "James," which had been inserted in the writ by mistake, was refused. Judge Story alludes to the United States statute of jeofails (Judiciary Act 1789, § 32

[1 Stat. 91]), and says it provides for amendments in form only—that by it "no authority is given to the courts of the United States to make any amendments in judgments, except as to defects and want of form," and this he says is not a matter of form, and there is nothing on the record to amend by. He further says: "It is plain that at common law, no judgment was amendable after the term at which it was entered, and amendments could be made in the process, &c., only while the cause stood in paper, and before judgment. The authority to amend them, even in England, in cases of this sort, is dependent upon and limited by statute." In Wood v. Luse [Case No. 17,950], a motion was made, after judgment rendered and the term elapsed, to set aside certain proceedings in the case. The court say, "If the motion was not objectionable on other grounds, it is clear that the proceeding on the original suit, and the notes on which it was founded, could not be revised in this manner." Referring to the New York practice, he says: "But by the common law, the judgment of a previous term cannot be set aside on motion; and this is the doctrine of the supreme court,"—"a clerical error in the entry of the judgment will be corrected at any time, but judgments cannot be set aside on motion, after the term at which they were entered." In Doggett v. Emerson [Id. 3,961], a motion was made (in equity) to vary a decree pronounced, but not actually entered, at a previous term. The motion was refused, and Judge Woodbury says: "But as an entry is necessary to complete their operation and give them full effect, like an enrollment of a decree, or a signature of it by the chancellor in England, it is in the power of the court to make changes in them before that is done, and probably before the term closes at which the entry is made." But after it is once pronounced and communicated to the parties, it would be, he says, "altogether destructive of judicial consistency and firmness to do so, unless made upon good and urgent cause, on a full rehearing by both parties." "There must be shown some obvious mistake of law or fact, or some new matter since discovered;" and he cites The Avery, above cited, as holding that the court will not grant a rehearing after the term has ended. In Jenkins v. Eldridge [Case No. 7,269], the court refused to vary a decree in chancery on petition. The judge says, "a decree is usually considered final after the end of the term at which it was rendered"—but may be before, as it was in this case. After it is final, a mere clerical mistake in figures or form, may be corrected on motion or petition, "but nothing done which goes to its merits and to the principles or orders themselves that have been made by the court." "In states where no statutes exist expressly remedying such cases, it is very questionable whether any

power exists at common law to re-open or change, in a material part, any final judgment." He refers to the case of Cameron v. McRoberts, above cited [3 Wheat. (16 U. S.) 591], and says, that though in that case "some years had elapsed, the principle is the same whether it be days or years, if the judgment has gone from the waste book and minutes, and been entered up as perfected." And he also refers to a case not reported (Dixon v. Lewis), before the supreme court, at January term, 1845, in which the circuit court had suspended a final judgment by default, on motion of the defendant, on the ground that he had been prevented from appearing by mistake as to the term of the court. The majority of the supreme court held that the court below had no power to suspend that judgment—but the case went off upon another ground.

In the state courts the same rule prevails. In Miller v. Hemphill, 4 Eng. (Ark.) 488, in chancery, an order was made, October 10, 1845, dismissing a cause for want of prosecution. On the 10th April, 1846, on motion and affidavits, the cause was reinstated. On appeal, it was held that that order "was clearly coram non judice, inasmuch as at the term next preceding, the cause had been dismissed for alleged want of prosecution." See, also, Smith v. Stinnett, 1 Pike, 501. In Hill v. Richards, 11 Smedes & M. 194, 199, a bill in chancery was dismissed in 1842, on account of the failure of complainant to give security for costs, as required by a previous order. In 1846, a receiver, who had been appointed, and had acted in the case before its dismissal, applied by petition to the court for an allowance, which was granted. On appeal the court say, "a petition, in many respects, very nearly resembles a motion, &c. Either one or the other is proper only when a case is pending," or when a court of chancery has jurisdiction on petition by express statute. "After the dismissal of the bill in 1842, the original cause was no longer in court, the parties were no longer before it, and its jurisdiction was at an end." This case was approved and same point decided in Starke v. Lewis, 1 Cushm. 151. In Deeds v. Deeds, 1 G. Greene, 394, a decree was granted in June, 1847, divorcing the parties, and giving the custody of children to the father. Afterwards a petition was presented to set aside the latter provision, and granted. On appeal, held erroneous. The appellate court say that part of the decree "is absolute, and cannot be changed, altered or reversed by any court except an appellate court," or by bill, &c., impeaching it for fraud, or matter arising afterward. In Burch v. Scott, 1 Gill & J. 393, the court of appeals held that "a decree signed and enrolled could not be reheard on petition," and that it would be considered as enrolled when signed by the chancellor and the term ended. In Pfeltz v. Pfeltz, 1 Md. Ch. Dec.

456, that case is cited and approved, and the same point decided. The court say, "it is clear that if an application were made by petition to open the enrollment and vacate the decree, it must be refused." The decree in this case was by default or pro confesso. In Thompson v. Ware, 8 B. Mon. 26, the court say, a decree can only be set aside for error or fraud. In the former case only by appeal or writ of error, or by bill of review —in the latter, only by an original bill. In Com. v. Shanks, 10 B. Mon. 304, the court below, after the end of the term, varied a judgment at law as to the costs. On appeal, held, "the order or judgment made at the November term was a final order—nothing was left open for the future action of the court, and no power was reserved to change or modify the judgment. If an execution had been issued not authorized by the judgment, the court could, at a subsequent term, have quashed it, &c., or quashed the taxation of costs, if improperly made by the clerk, but they had no authority to correct their final judgment, after the close of the term at which it was made." In Ashby v. Glasgow, 7 Mo. 320, a motion was made to set aside a judgment for costs made at a previous term—refused. On appeal, held, "when the term is past, then the control of the court ceases, and no alteration or amendment can be made but such as is authorized by the statute of jeofails and amendments." In Lindell v. Bank of Missouri, 4 Mo. 228, judgment was rendered, November term, 1825, against the bank. The record stated that the parties "appeared by their attorneys." In 1833 the bank moved to set aside the judgment, on the ground that there had been no notice or lawful process served. Motion granted. On error to the supreme court, the court say: "The only question to be considered is, whether the court could, contrary to the record, receive proof that the parties were not rightfully in court. The record says the bank appeared by attorney. This must stand as true; at all events, it cannot be contradicted by affidavit. If this were allowed, then every judgment rendered in a court of record would at all times be subject to the same proceeding; no property would be safe, the sanctity of a record would be lost, and with it all security for right. It may be, if the attorney who appeared for the bank, did so by mistake, this mistake, if discovered, might be corrected during the term, but hardly afterwards." In Lampsett v. Whitney, 3 Scam. 170, a motion was made at December term, 1841, to rehear a cause decided at December term, 1840—refused. The court say: "One term has intervened, &c., and it is now too late to make it. The court conceives it has no power over the case." "It is believed that in no instance has the court entertained a petition for a rehearing after the lapse of a term."

From these cases it appears that it is not in admiralty courts alone that this rule prevails. It may at first view seem harsh, and in some cases it may operate hardly. Yet it is the only safe rule that can be followed. Any other practice would destroy the sanctity and conclusiveness of records, open the door to endless litigation, unsettle rights of property and person, cause delay, expense and ruin—"Interest reipublicae ut sit finis litium"—it would accumulate and clog the business of the courts, and render it impossible to get through it. As the rule now is, parties understand their rights and duties, and it becomes them to be vigilant and prompt, and not to sleep upon them. Now what effect does rule 40, of which we have spoken, have? It does alter the general practice, so far as to allow a decree by default to be opened, on good cause shown, after the decree is rendered, and even after the term is ended, in cases where the term ends before the ten days are expired. But the privilege thus given is expressly limited to the ten days specified, and unless applied for within that period, no benefit whatever can be derived from that rule. The rule carries with it no power or force beyond its express terms. The court, in making that rule, evidently had in view the general admiralty practice, which forbids, as we have shown, any interference with a decree after it is once rendered. In a spirit of liberality, the court saw fit to relax that general rule to a certain extent, and no more. The fact that it did so relax it does not authorize this court to relax it still more. The fact that it fixed the limit and the boundary is evidence that it intended that that limit should not be passed. The rule is to be construed as if it were a law, and it has all the force of a statute. This appears from the history of its adoption.

Congress, on the 23d of August, 1842, passed an act (section 6, 5 Stat. 516) authorizing the supreme court to adopt rules for the government of the admiralty courts. In pursuance of this act, the supreme court, at January term, 1845, adopted these rules. The rules so adopted were in effect adopted by congress itself, the supreme court being but its agent for that purpose. In the state courts of Michigan it is held that their rules, adopted in a like manner, have the force of statutes. But whether they are to be considered as a statute passed by congress or not, yet they are prescribed by the supreme court, and are the law of this court, which is a subordinate one, and bound to obey the requirements of its superior. So far as this court then is concerned, they are, at all events, "a law," and to be considered as such. There are many authorities which hold that a rule, even of its own making, is a law of the court—and that the court has no discretion to depart from them. Ram. Leg. Judgm. 33; Ogden v. Robertson, 3 Green [15 N. J. Law] 124; Rex v. Mann, 2 Strange, 755; Dunbar v. Conway, 11 Gill & J. 92; Wall v. Wall, 2 Har. & G. 79; Thompson v. Hatch,

3 Pick. 512. A fortiori, this will apply to a rule prescribed by a superior court. A rule may be extended on application beforehand, but when once the period prescribed by a rule is passed, rights have vested which the court cannot take away.

Now then, construing this rule as a law, what operation is to be given to it? Dwarris (on Statutes, 641) says: "It is a maxim, generally true, that if an affirmative statute which is introductive of a new law, directs a thing to be done in a certain manner, that thing shall not, even although there are no negative words, be done in any other manner." Again: "If a new power be given by an affirmative statute to a certain person by the designation of that one person, although it be an affirmative statute, all other persons are in general excluded from the exercise of the power, since inclusio unius est exclusio alterius. Thus, if an action founded on a statute be directed to be brought before the justice of Glamorgan, in his sessions, it cannot be brought before any other person, or in any other place." Again, at page 667, he says: "An act of parliament sometimes directs the manner in which a defendant shall be entitled to take advantage of the enactment, as by pleading the statute in bar; in such cases the party must pursue the remedy pointed out, or if he do not avail himself of it at the proper time, and in the manner and form prescribed, he cannot take advantage of it afterwards."

At 6 Bac. Abr. 383, 384, the following rules for the construction of statutes are laid down. He says we must consider the old law, the mischief, the remedy, and the reason of the remedy. He says: "The best construction of a statute is to construe it as near the rule and reason of the common law as may be." "When a statute directs a thing to be done generally, and does not appoint any special manner, it shall be done according to the course of the common law." "In all doubtful matters, and where the expression is in general terms, statutes are to receive such a construction as may be agreeable to the rules of the common law in cases of that nature; for statutes are not presumed to make any alteration in the common law, farther or otherwise than the act expressly declares; therefore, in all general matters, the law presumes the act did not intend to make any alteration, for if the parliament had had that design they would have expressed it in the act." Again: "If a new remedy be given by statute in any particular case, this shall not be extended to alter the common law in any other than that case." Again: "A thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter." Again, at page 391: "Every statute ought to be construed for the preventing of delay as much as possible." "If the meaning of a statute is doubtful, the consequences are to be considered in the construction; but where the meaning is plain, no consequences are to be regarded, for this would be assuming a legislative authority." "A statute creating a new jurisdiction ought to be construed strictly."

Let us apply these rules to the present case: This rule 40 gives a new remedy—it is an innovation on the common law of admiralty (so to speak)—it gives a new jurisdiction to the court. It is, therefore, to be construed strictly—as near the common law rule as possible. It is not to be presumed the rule was intended to alter the common law rule "farther or otherwise than it expressly declares." This rule is calculated to cause delay. It must be so construed as to prevent delay "as much as possible." But the important point is, that the remedy given is to be sought in a special manner, and at a special time, and it cannot be done in any other manner. The words of Dwarris, at page 667, are expressly applicable. This principle is a plain one, and is acted upon every day. For instance, the statutes of Michigan authorize the defendant to redeem land sold under execution at any time within twelve months. No one has ever claimed that that statute gave him any privilege beyond its express letter, or that he could redeem an instant beyond the time fixed. Again, it is a principle that applies to contracts and statutes both, that the express enumeration or adoption of certain things is an exclusion of all others. Judge Leavitt, in the case of Ward v. The Ogdensburgh [Case No. 17,158], commenting on Adm. Rule 15 (which allows, in cases of collision, a suit either against the ship and master, or against the ship alone, or against the master or the owner alone in personam), said that inasmuch as this rule expressly enumerated those classes of suits, it was in effect a prohibition of all others; and he held that an action against the ship and owners could not be sustained; and he cites several cases to sustain his decision; and his decision on this point was not reversed on appeal, the point being abandoned by counsel. In Marbury v. Madison, 1 Cranch [5 U. S.] 144, a question arose as to the extent of the original (contradistinguished from appellate) jurisdiction of the supreme court. The constitution declares that "the supreme court shall have original jurisdiction in all cases affecting ambassadors, &c. In all other cases it shall have appellate jurisdiction." It was insisted that as the clause giving original jurisdiction contained no negative word, the congress could by statute give it in other cases than those enumerated. But the court held otherwise, and said, "affirmative words are often in their operation negative of other objects than those affirmed; and in this case, a negative or exclusive sense must be given to them, or they have no operation at all." Judge Story (1 Com. Const. § 448) says: "There are certain maxims which have found their way, not only into judicial discussion, but into the business of common life, as

founded in common sense and common convenience. Thus it is often said that in an instrument a specification of particulars is an exclusion of generals, or the expression of one thing is the exclusion of another. Lord Bacon's remark, that 'as exception strengthens the force of law in cases not excepted, so enumeration weakens it in cases not enumerated,' has been perpetually referred to as a fine illustration." Again: "There can be no doubt that an affirmative grant of power in many cases will imply an exclusion of all others. As for instance, the constitution declares that the power of congress shall extend to certain enumerated cases. This specification of particulars evidently excludes all pretension to a general legislative authority. Why? Because an affirmative grant of special powers would be absurd as well as useless, if a general authority were intended."

In the present case, to give this court power to open a decree at any time within ten days, would be useless, if the supreme court meant or understood that they had the same power without the rule, or that they had it after the ten days expired. The affirmative grant, I think, of the ten days' limit, is an exclusion and prohibition of all other time. Again, Judge Story, speaking of the constitutional powers of the government, says (1 Com. Const. § 426): "On the other hand, a rule of equal importance is not to enlarge the construction of a given power beyond the fair scope of its terms, merely because the restriction is inconvenient, impolitic, or even mischievous. If it be mischievous, the people may remedy it." If they do not choose to do so, the presumption is, that the mischief done by a restriction of power, is less than would arise by its extension. It is a choice between two evils, choosing the least. The same remark will apply to grants of judicial power; the grant is not to be extended by construction beyond its fair terms. If mischief ensues in individual cases, it is better to bear that than the greater evil of extending the power.

If I am correct in the foregoing views, then, inasmuch as the ten days allowed by the rule elapsed before this motion was made, it cannot be entertained. It will undoubtedly operate harshly upon the defendant in this case; but I am satisfied that if he is entitled to any relief, it must be obtained by some other proceeding. Motion denied.